IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|   |   |   |
|---|---|---|
| JOHN T. WARD, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO.: WDQ-06-3328 |
| THE CHARLESTON RESTAURANT, d/b/a RESTCO, LLC, ET AL., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

John T. Ward sued The Charleston Restaurant ("Charleston") d/b/a Restco, LLC, Tony Foreman, and Cindy Wolf for racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII")[1] and 42 U.S.C. § 1981, and wage violations of the Fair Labor Standards Act of 1938 ("FLSA")[2] and the Baltimore City Code.  Pending is the Defendants' motion for summary judgment.  For the following reasons, the Defendants' motion will be granted.

I.   Background

Ward, who is African American, was a server at Charleston, an upscale restaurant in Baltimore, Maryland owned by Foreman and

---

[1] 42 U.S.C. §§ 2000e to 2000e-17 (2000).

[2] 29 U.S.C. §§ 201 to 219 (2000).

1

Wolf.  Charleston servers are required to pay for uniforms. Charleston fronts the cost of the uniforms, and then collects payment from employees.  In December 2003, Greta Clausen was promoted from server to the Director of Service.  In June 2004, Ward and several other employees were late with payment.  Clausen was responsible for collecting the money, and testified that Ward paid several weeks after other employees.  Greta Clausen Dep. 98:5-101:7, Apr. 8, 2008.  Ward disagreed, testifying that female servers were given additional time to pay for the uniforms, and paid after he did.  John Ward Dep. 126:4-128:21, Feb. 26, 2008.

Ward also alleged that Clausen referred to him as "beneath her on the evolutionary chain" while she was a server.  Ward Dep. 66:20-67:1.  The comment was made during a 2002 discussion about capital punishment, which Ward advocates and Clausen does not. Clausen acknowledges that she said that those who believe in capital punishment were on a "different evolutionary rung," but that the comment was not directed at Ward.  Greta Clausen Dep. 94:1-96:5, Apr. 8, 2008.  Clausen stated that she was not aware that Ward was upset about the discussion until he filed a discrimination charge in July 2004.  *Id.* 97:15-98:18.

On July 16, 2004, Foreman received a letter from Ward in which he asserted claims of racial and gender discrimination. Foreman responded by letter that day, requesting that Ward detail the discriminatory acts that had been committed.  When Ward

2

arrived for his shift that day, he refused to speak with Foreman and was sent home. Ward was suspended, but was reinstated when he spoke with Foreman on July 20, 2004.

In late July 2004,[3] Ward filed a charge of discrimination with the Maryland Commission on Human Relations ("MCHR"). In the charge, Ward alleged race and sex discrimination, and mentioned Clausen's promotion as an example of discriminatory conduct. Ward also alleged that he had been called "a Nigger." Def.'s Ex. 13.

After Ward was reinstated, Foreman received two letters from Ward detailing discriminatory acts. Def.'s Exs. 9, 14. Ward stated that four co-workers, Nina Markowitz, Heather Beckman, Brandon O'Loughlin, and Ken Minkove had used "nigger" in his presence or directed the term at him. Def.'s Ex. 9. Foreman investigated Ward's allegations and asked current and past employees to complete surveys about Ward's claims. Although Foreman determined that the claims were "baseless," John Antony Foreman Dep. 313:16-17, Feb. 28, 2008, Charleston held mandatory meetings about the restaurant's antidiscrimination policy which

---

[3] The parties do not dispute that Ward filed the discrimination charge on July 19, 2004. As the charge includes details of a conversation Ward had with Foreman on July 20, 2004, however, the asserted filing date is inaccurate. Given that Foreman did not receive notice of the filing until August 11, 2004, it is likely that either an August 5, 2004 date contained in the charge or an August 10, 2004 date next to the authorized MCHR signature is the proper filing date.

is contained in the employee handbook.

During the Fall of 2004, Ward received several written reprimands for insubordinate and disruptive behavior during his shift. On January 7, 2005, Ward filed a second charge of discrimination with the MCHR, alleging retaliation. As an addition to his first charge, Ward also stated that he had been "removed from the normal work schedule" during early July 2004. Def.'s Ex. 32. Ward also claimed that since filing his first charge, he had been given more work, received additional management scrutiny, and had been disciplined for failing to appear for work when others had not been disciplined for similar behavior. *Id.*

On April 11, 2005, Ward wrote a letter to Foreman and Wolf, stating that Ryan McFeely, a co-worker, had made several inappropriate homosexual remarks around him. Ward also stated that he was offended by his co-workers' use of "ghetto" to describe people or things. Foreman responded by letter on April 15, 2005, stating that he advised McFeely not to make sexual remarks, and that the "ghetto" comments were being investigated. Foreman had also written Ward a letter on April 11, 2005, detailing several instances of unsatisfactory performance and addressing Ward's negative attitude during work.

During the fall of 2005, Ward received several additional written reprimands for poor performance. On October 21, 2005,

Ward made several disparaging comments about Charleston to customers, and received an additional reprimand.  The following day, Foreman and Clausen met with Ward, and informed him that if he continued this behavior, he would be terminated.  On October 25, 2005, Foreman fired Ward.

On February 23, 2006, Ward filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC").  Ward alleged that Charleston fired him because of his discrimination charges, and mentioned the homosexual remarks and the "ghetto" comments.  Ward also stated that his pay was garnished in August 2005.

On February 13, 2006, Ward sued Charleston and Foreman in this Court.  On June 14, 2007, the Court granted Ward's motion to file a second amended complaint, in which he added Wolf as a defendant.  On May 9, 2008, the Defendants filed this motion for summary judgment.

II. Analysis

A. Standard of Review

Under Rule 56(c), summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

5

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must view the facts and reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). The opposing party, however, must produce evidence upon which a reasonable factfinder could rely. *Celotex*, 477 U.S. at 324. The mere existence of a "scintilla" of evidence is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

B. Title VII Claims

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. 2000e-2(a)(1). A plaintiff may avoid summary judgment and establish a claim of intentional race discrimination under a "pretext" framework. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc).

Under the pretext framework, the plaintiff must establish, by a preponderance of the evidence, a prima facie showing of racial discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff establishes a

prima facie case, then the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Hill*, 354 F.3d at 285. If the employer provides evidence of such a reason, the burden shifts to the plaintiff to establish that the employer's explanation was a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also Burdine*, 450 U.S. at 256.

1. Failure to Promote

Ward contends that he was not promoted to the Director of Service position[4] because of his race. To establish a prima facie case, Ward must show that: (1) he is a member of a protected group; (2) there was a specific position for which he applied; (3) he was qualified for the position; and (4) his application was rejected under circumstances giving rise to an inference of unlawful discrimination. *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998); *see also Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).

---

[4] Ward also contends that he was not promoted to maître d'hôtel in 2000, or sommelier in 2002 or 2003 because of his race. As Ward's first charge of discrimination was filed in late July 2004, Ward's non-promotion claim for maître d'hôtel is barred by Title VII's statute of limitations. *See Ashton ex rel. Ashton v. Okosun*, 266 F. Supp. 2d 399, 403 (D. Md. 2003) (Maryland has a 300-day filing requirement for Title VII claims). Even if Ward's non-promotion claim for the sommelier position is not barred by limitations, he has not articulated any facts to support his claim of discrimination. Accordingly, the Court will address only Ward's non-promotion claim for the Director of Service position.

7

The Defendants argue that Ward did not apply for the Director of Service position, and even if he had applied, he was not qualified.  Whether an employer's promotion process is formal or informal dictates whether an employee must apply for a vacancy.  *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004).  If the promotion process is informal and employees are not aware of vacancies, an employee is not required to apply. *Id.* at 430.

Ward did not apply for the Director of Service position and therefore cannot meet his prima facie case.  Although Foreman acknowledged that the promotion process was informal, *see* Foreman Dep. 157:4-16, Ward never told Foreman that he was interested in the position.[5]  When then-Director of Service Michael Plakosh left Charleston in the fall of 2003, Ward was aware that there was an opening, but only asked Foreman whether he could meet with him.  Ward Dep. 263:1-265:7.  Indeed, Ward acknowledged that he "failed to communicate clearly that I wanted--why I wanted to sit down with him."  *Id.* 265:6-7.  As Ward did not apply for the Director of Service position, summary judgment must be granted on

---

[5] Ward consistently relies on his second amended complaint or his filed discrimination charges as the factual basis for his claims.  As the pending motion is for summary judgment and the Defendants rely on depositions, documents, and affidavits in support of their motion, the Court must rely on those evidentiary materials, and not Ward's pleadings.  *See* Fed. R. Civ. P. 56(e) (properly supported summary judgment motion may not be rebutted by relying solely on pleadings).

his Title VII non-promotion claim.[6]

2. Hostile Work Environment

Ward also argues that he was subject to a racially hostile work environment at Charleston. To establish a hostile work environment claim under Title VII, Ward must demonstrate harassment that was: (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) imputable to Charleston. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).

In making this determination, courts look to all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere[ly] offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Hostile work environments generally result from "an accumulation of discrete instances of harassment," *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006), but

---

[6] As the same elements are required for non-promotion claims under Title VII and § 1981, *see Bryant v. Aiken Regional Med. Ctrs. Inc.*, 333 F.3d 536, 545 n.3 (4th Cir. 2003), summary judgment will also be granted on Ward's § 1981 non-promotion claim.

9

"simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

An employer is liable for harassment by the victim's co-workers "if it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003). Upon receiving notice, the employer must take remedial action reasonably calculated to end the harassment. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).

Although the vile epithet Ward alleges his co-workers used was unwelcome and racist, Ward did not report its use to Foreman or other supervisors until he filed his first MCHR charge. Ward Dep. 137:15-138:1. When Foreman became aware of Ward's allegations in July 2004, he immediately took action by interviewing employees, requesting that they complete surveys and write statements about Ward's allegations, and held several mandatory meetings in August 2004 to discuss Charleston's antidiscrimination policies. Once aware of the racial epithet allegations, Foreman and Charleston took reasonable actions that were intended to stop the harassment.

Similarly, the homosexual comments and "ghetto" terminology were quickly addressed once Foreman was aware of them. Ward made

10

these concerns known in an April 11, 2005 letter to Foreman, who immediately investigated the claims. Foreman told McFeely to refrain from discussing sexual matters at work, and received written statements from employees who used the term "ghetto." *See* Def.'s Ex. 38. As Foreman took reasonable remedial actions to address Ward's complaints and Ward did not allege that the behavior continued, the comments did not result in a hostile work environment at Charleston.

The "evolutionary chain" comment alleged to have been made by Clausen also did not result in a hostile work environment for Ward. Assuming that Ward reported the comment to Foreman and that he failed to remedy the situation immediately, there is little indication that the comment related to race. Ward acknowledged that Clausen's statement was in the context of a capital punishment discussion, but emphasized that he believed it to be a racist statement. Ward Dep. 70:5-72:9. Clausen stated that she made a generalized statement that people who agreed with the death penalty were on a lower evolutionary rung. Clausen Dep. 96:9-17. This isolated comment is insufficient to establish a hostile work environment. Accordingly, summary judgment will be granted on Ward's hostile work environment claims.

3. Disparate Treatment

Ward argues that he was treated differently from Caucasian co-workers because he was not afforded extra time to pay for his

11

uniform.[7]  Beyond stating that he believed Charleston's uniform policy was unfair, Ward has not demonstrated that he suffered an adverse employment action.  *See, e.g.*, *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (disparate treatment claims require plaintiff to suffer adverse employment action).  Indeed, all Charleston employees were required to pay for their uniforms, and payment extensions were granted to other employees and Ward.  Clausen Dep. 99:2-100:20.  Accordingly, summary judgment will be granted on Ward's disparate treatment claim.

4. Retaliation

Ward contends that the Defendants retaliated against him for complaining about discrimination.  To establish a Title VII or § 1981 retaliation claim, Ward must demonstrate: (1) his engagement in a protected activity; (2) caused; (3) the Defendants to act adversely against him.  *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).  Ward's internal complaints to Foreman and filing of the MCHR and EEOC charges are protected activities.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

---

[7] Ward also argues that he was treated differently from Caucasian co-workers because he was not given the opportunity to apply for other employment positions.  As discussed *supra*, Ward did not apply for the Director of Service position, and his claim for other available positions is time-barred or not supported.  Thus, summary judgment will be granted on his disparate treatment claim for hiring opportunities.

Ward alleges that after he filed his first charge of discrimination in July 2004, he was subject to a series of unfair disciplinary actions, a reduction in his work schedule,[8] threatening behavior,[9] and, he was terminated.  As Ward has not established a causal connection between his protected activity and Defendants' conduct, however, summary judgment will be granted on Ward's retaliation claims.

From October 2004 to October 2005, Ward received six written disciplinary charges for reasons such as poor table service, insubordination, and unexplained absences.  Def.'s Exs. 8, 26-31.  The final incident which led to Ward's termination was when he made disparaging comments about Charleston's entrees and desserts on October 21, 2005.  *Id.* Ex. 31.  Although Ward disputes the characterization of his statements, Ward Dep. 172:17-174:12, Clausen and Marcie Prince heard the statements, wrote them down that evening, and reported them to Foreman.  Def.'s Ex. 22 (Marcie Prince Aff. ¶¶ 5-6, Mar. 25, 2008); Foreman Dep. 271:11-13; Clausen Dep. 79:11-16.  Foreman met with Ward on

---

[8] Although Ward alleged that he was not allowed to work from July 19, 2004 to July 22, 2004, he acknowledged that once he spoke with Foreman on July 20, his suspension was lifted, but he declined his shift.  Ward Dep. 224:13-226:5.  His next scheduled shift was on July 23, 2004, and he worked that day.  *Id.* 225:1-3.

[9] Ward stated that when he informed Foreman that he filed a discrimination charge, Foreman called him a "fucking idiot."  Ward Dep. 221:6-11.  Although this statement was inappropriate, it is not an adverse employment action.

that evening, and discussed the situation again with him the following day. Def.'s Ex. 33. On October 25, 2005, Foreman terminated Ward for his continued disruptive behavior, poor behavior with diners, and disrespectful attitude toward management. Def.'s Ex. 34. Ward's termination was not retaliatory; rather, it was the result of Ward's disparaging comments about Charleston, his poor performance, and inability to work well with his co-workers.[10] Accordingly, summary judgment will be granted on Ward's retaliation claims.

C. FLSA Claim

The Defendants contend that the FLSA does not apply to Ward because he does not meet FLSA's definition of employee. The Defendants also argue that the FLSA does not apply to Foreman or Charleston because they are not covered enterprises. Ward disagrees.

Under the FLSA, an "enterprise engaged in commerce" is one that has: (1) employees engaged in commerce or handling goods moved in commerce; and (2) annual gross sales of at least $500,000. 29 U.S.C. § 203(s)(1)(A) (2000). "Commerce" is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and

---

[10] When Foreman and Wolf renovated Charleston in July 2005 and changed its format, several experienced servers were laid off; Ward was not among them. Foreman Dep. 58:8-17. This also suggests the lack of causality between Ward's discrimination charges and the Defendants' conduct and Ward's termination.

14

any place outside thereof." *Id.* § 203(b). As the FLSA is a federal statute, the commerce definition refers to interstate commerce. *See Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 693 (4th Cir. 1990).

The Defendants acknowledge that Charleston generates annual gross sales in excess of $500,000, but emphasize that Ward has not provided evidence that Charleston is "engaged in commerce." Without any admissible evidence from Ward, the Court will not speculate that Charleston is "engaged in commerce." Accordingly, summary judgment will be granted on Ward's FLSA claims.[11]

III. Conclusion

For the reasons discussed above, the Defendants' motion for summary judgment will be granted.

July 25, 2008                              /s/
Date                              William D. Quarles, Jr.
                                  United States District Judge

---

[11] As summary judgment will be granted on all Ward's federal claims, the Court will decline supplemental jurisdiction over Ward's state law wage and hour claims. *See* 28 U.S.C. § 1367(c)(3).

15